UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.: _____

| | |
|---|---|
| MOON AND STAR LOGISTICS, LLC, a Pennsylvania limited liability company,<br><br>          Plaintiff,<br><br>v.<br><br>DIRECT TRAFFIC SOLUTIONS, INC., a Florida corporation<br><br>          Defendant. | |

## COMPLAINT

Plaintiff, Moon and Star Logistics, LLC brings this action for damages against Defendant, Direct Traffic Solutions, Inc. ("Direct Traffic") and, in support of its claims, states as follows.

## PRELIMINARY STATEMENT

Through this lawsuit, Plaintiff – a small trucking business that had grown to annual revenues of over $500,000 – seeks to hold Direct Traffic liable for publishing a knowingly false report that decimated the Plaintiff's growing business.

Specifically, in March 2023, Direct Traffic was swindled by a non-party, Kevin Banner ("Fraudster"), into paying thousands of dollars by falsely claiming that he worked for Plaintiff. Although the Plaintiff made clear to Direct Traffic that it had no association with the Fraudster, that it had never received any funds from Direct Traffic, and that Plaintiff had alerted the authorities to the fraud, Direct Traffic posted a knowingly false report about Plaintiff on Carrier411, an industry-leading website used nationwide by brokers to vet whether freight carriers (like Plaintiff) are reputable. The report falsely claimed that Plaintiff, in its capacity as a freight carrier for Direct Traffic: (i) allowed an unauthorized re-brokering of the shipment, (ii) modified

the parties' agreement while the load was in transit, and (iii) performed "fraudulent activity" and "unethical or deceptive practices." The report ended with the following directive to all Carrier411 brokers: "DNU [do not use] they are extremely shady and will illegally re-broker your load."[1]

As a result of Direct Traffic's actions, Plaintiff's growing business – which had increased its revenue between 2021 and 2022 by approximately 125 percent – has been decimated. In fact, as a direct result of Direct Traffic's false report, Plaintiff has lost its business relationships (including a new $700,000 contract it had just secured); Plaintiff lost its truck drivers; and Plaintiff was forced to sell three of its four trucks, with the last truck sitting at the shop waiting to be sold. As a result, Plaintiff filed this lawsuit for defamation.

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff is a limited liability company existing under the laws of Pennsylvania with its principal place of business in Avoca, Pennsylvania. At all times material to this complaint, Plaintiff's sole member, Mumin Caliskan, has been domiciled in Avoca, Pennsylvania, as he has continuously resided there with the intention to remain indefinitely.

2. Defendant Direct Traffic is a Florida corporation with its principal place of business at 851 Broken Sound Parkway, Boca Raton, FL 33487.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity amongst the parties and the amount in controversy exceeds $75,000.

4. Venue is appropriate in this District pursuant to 28 U.S.C. §1391(b)(1) because Direct Traffic resides and conducts business in this District.

---

[1] Plaintiff has not named Carrier411 as a defendant, but Plaintiff will seek discovery to determine the extent of Carrier411's involvement with creating the false report.

5.      This Court has personal jurisdiction over Direct Traffic because it (i) is and, at all times relevant to this Complaint was, a resident and citizen of Florida, (ii) operates, conducts, engages in, or carries on a business or business venture in this state or has an office or agency in this state Florida, (iii) committed a tortious act in Florida that gave rise to this action, and (iv) engages in substantial and not isolated activity within Florida.

## STATEMENT OF FACTS

### A. Carrier411 Purports to Compile and Publish Accurate, Up-to-Date Information About Freight Carriers

6.      Carrier411 operates a website available to customers across the United States, including customers in Florida. As part of its website and services, Carrier411 provides information to its customers, including brokers, shippers, and other logistics industry professionals, concerning trucking companies and freight carriers.

7.      Carrier411 advertises itself as an "industry-standard ultimate big data platform for brokers, shippers, factoring companies, and other qualified logistics industry professionals" and touts that "[m]ore than 3,000 freight brokers and shippers rely on our platform every day for carrier selection, including 97 of the top 100 brokers based on net income."[2] Carrier411 further states that it is "an essential service for freight brokers" intended to "[r]educe your chances of hiring carriers that cancel loads, double broker freight, hold loads hostage, and have unresolved cargo claims."

8.      As a part of its offerings, Carrier411 allows brokers and shippers to submit "FreightGuard Reports." FreightGuard Reports are supposed to be honest reviews submitted by brokers about the services provided by freight carriers (like Plaintiff).

---

[2] Available at https://www.carrier411.com/ (Last visited September 12, 2023).

3

**B. Direct Traffic is Defrauded Due to its Failure to Perform Diligence Before Paying a False Payment Demand**

9. Direct Traffic is in the business of brokering freight carrier transactions (i.e., matching shippers with freight carriers).

10. On or around March 21, 2023, Direct Traffic was the victim of fraud when it received an email from the Fraudster, who falsely represented that he worked for Plaintiff. The email stated: "[g]ood morning I have done a load and I need Quick pay," and it further stated that he was entitled to payment in the amount of $2,156.00.

11. Despite the suspicious demand for "quick pay," Direct Traffic did nothing to confirm whether the demand was legitimate.

12. Direct Traffic did not verify whether the Fraudster's email address (moondstarlogistics@gmail.com) was the same as the Plaintiff's registered email address (moonandstarlogistics@gmail.com).

13. Direct Traffic did not contact Plaintiff at its registered email address – even though, upon information and belief, that information is available on Carrier411 – to confirm the legitimacy of the payment demand, a practice that many brokers follow given fraud in the industry.

14. Plaintiff has no association with the Fraudster, and Plaintiff was not involved with the load for which the Fraudster communicated with Direct Traffic. When Plaintiff became aware of the fraud, he reported it to the relevant authorities, including the FBI.

15. As a part of the investigation, Special Agent Benion with the U.S. Department of Transportation spoke with Direct Traffic about the fraud.

16. In all, Plaintiff was involved in a monthslong investigation that ultimately resulted in the disabling of the email address and telephone number used in the fraud.

4

C. **Direct Traffic Attempts to Shift Responsibility for its Lack of Diligence**

17.     On May 10, 2023, in a clear attempt to exert pressure on Plaintiff, Direct Traffic filed a false FreightGuard Report on Carrier411.

18.     The FreightGuard Report provided, in pertinent part, as follows:

> **THE FOLLOWING ITEMS WERE REPORTED:**
> - UNAUTHORIZED RE-BROKERING OF SHIPMENT
> - IN-TRANSIT AGREEMENT MODIFICATION
> - FRAUDULENT ACTIVITY
> - UNETHICAL OR DECEPTIVE BUSINESS PRACTICES
>
> **ADDITIONAL COMMENTS:**
> CARRIER BOOKED A LOAD WITH US. THIS LOAD WAS THEN GIVEN TO CRYSTAL CLEAR FREIGHT SOLUTIONS (DOT 3760345/MC 1338446), A BROKER. THIS COMPANY THEN GAVE IT TO ANOTHER MOTOR CARRIER. UNFORTUNATELY, THIS WAS FOUND OUT AFTER THE MOTOR CARRIER HIRED A LAWYER TO RECOVER THEIR AGREED ABOUT RATE ($1,800 MORE THAN WHAT WAS ORIGINALLY AGREED UPON). DNU THEY ARE EXTREMELY SHADY AND WILL ILLEGALLY RE-BROKER YOUR LOAD.

19.     The FreightGuard Report includes false assertions of fact, including Direct Traffic's representations that Plaintiff did the following:

   a. performed an unauthorized re-brokering of a shipment for Direct Traffic;

   b. attempted to modify the parties' agreement while a shipment was in transit;

   c. had engaged in fraudulent and unethical activity; and

   d. brokered a load with Direct Traffic and gave the load to another carrier.

20.     Direct Traffic published the FreightGuard Report to Carrier 411's thousands of users, which included then-existing clients of Plaintiff, Convoy Inc. and United Eagle Inc.

21.     Direct Traffic published the FreightGuard Report, and refused to remove it, despite Plaintiff's numerous oral and written communications to Direct Traffic explaining that Plaintiff had no involvement with the load for which Direct Traffic paid the Fraudster.

22.     Sherri Smith, Director of Safety & Claims for Direct Traffic, all but acknowledged that the FreightGuard Report was published to compel Plaintiff to pay for the Fraudster's misdeeds.

5

In an email to Plaintiff and Special Agent Benion, Sherri Smith made clear that Direct Traffic would not remove the FreightGuard Report *against Plaintiff* until Direct Traffic was reimbursed for the funds paid to *the Fraudster*. Ms. Smith also acknowledged that Plaintiff was *not the fraudster* when she told Special Agent Benion the following: "Please let me know if you need anything further from DTS to aid in the investigation. We appreciate you looking into these bad guys running scams within the industry."

23. Direct Traffic submitted the false FreightGuard Report and allowed it to remain available for public consumption for *several months*, despite its knowledge that its payment to the Fraudster was a result of the actions of "bad guys running scams within the industry."

24. Despite that knowledge, the FreightGuard report contains no information suggesting that Plaintiff was also the victim of fraud; that Plaintiff was not responsible for the Fraudster's actions; or identifying the obvious signs of the fraud that could help other brokers avoid the Fraudster (i.e., an email address that did not match that of Plaintiff's).

25. Through the FreightGuard Report, Direct Traffic knowingly and falsely published online to thousands of freight brokers false information about Plaintiff's business operations.

26. Direct Traffic did not restrict its defamatory statements to Carrier411. Plaintiff was informed by a broker, Hickory Transportation, that Direct Traffic filed a similar report on a website called My Carrier Portal (www.mycarrierpackets.com). Because of this report, Hickory Transportation refused to do business with Plaintiff.[3]

---

[3] Plaintiff does not have a copy of the report Direct Traffic published on My Carrier Portal, but it will seek a copy in discovery. From discussions with Hickory Transportation, similar to the FreightGuard Report, the report Direct Traffic published on My Carrier Portal falsely disparages Plaintiff's business operations.

### D. Plaintiff Suffers Irreversible Damage to its Business

27. Once Plaintiff discovered that Direct Traffic had published the FreightGuard Report on Carrier411's website, Plaintiff attempted to contact Carrier411. However, Carrier411 had blocked Plaintiff's number. Unable to contact Carrier411, Plaintiff pleaded with Direct Traffic to remove the false FreightGuard Report because it was destroying Plaintiff's business.

28. In its desperate attempt to have the false FreightGuard Report removed, Plaintiff's owner wrote to Direct Traffic as following: "At this point, I'm only complaining about the Report destroying my business. [I]t is still unfair to me that report is out there and my reputation [is] being destroyed as we speak because you know all the brokers [are] checking the report and deactivating my profiles without even looking at the response."

29. Neither Carrier411 nor Direct Traffic took any steps to remove the false FreightGuard Report or to minimize the foreseeable impact it would have on Plaintiff's business.

30. As a result of Direct Traffic publishing the FreightGuard Report, brokers refused to hire Plaintiff to carry their loads.

31. For example, on May 24, 2023, shortly after Direct Traffic published the FreightGuard Report, Plaintiff received the following message from one of its brokers, Convoy Inc., disabling its account and its ability to do business through Convoy:

> Hello,
>
> Convoy utilizes third party carrier monitoring and reporting services, and considers that information when reviewing our carrier compliance criteria.
>
> Your account has been flagged to Convoy's Quality & Compliance team because of one or more reports of alleged carrier infractions.
>
> While Convoy and the reporting service do not investigate and take no position on the accuracy of such reports, in an abundance of caution, your account has been removed from Convoy's platform.
>
> You may provide a detailed response to what occurred causing these reports for further consideration.

32. Two days later, due to the FreightGuard Report, Plaintiff lost a new contract with a broker that guaranteed Plaintiff "minimum gross linehaul of $700,000." Like the Convoy cancellation, the stated reason for this contract termination was the false FreightGuard Report: "This contract terminated due to carrier 411 reports."

33. The FreightGuard Report did exactly what Direct Traffic knew it would do – that is, stop brokers from doing business with Plaintiff.

34. As a result of Direct Traffic's actions, Plaintiff's growing business has been destroyed. With brokers refusing to use its services, Plaintiff lost a new $700,000 contract it had just secured; Plaintiff lost its truck drivers; and Plaintiff was forced to sell three of its four trucks, with the last truck sitting at the shop waiting to be sold. Plaintiff's growing business – conservatively valued between $350,000 and $450,000 – has been decimated.

35. On August 3, 2023, Plaintiff sent a five-page letter to Direct Traffic specifying that the statements in the FreightGuard Report were defamatory, outlining the damages caused, and demanding payment to compensate Plaintiff for the loss of its business. Although Direct Traffic did respond, it did not agree to compensate Plaintiff for its losses.

36. All conditions precedent to the institution of this action have occurred, have been performed, satisfied, or waived.

## COUNT I (DEFAMATION PER SE)

37. Plaintiff incorporates and realleges paragraphs 1-36.

38. At all times relevant to this Complaint, Direct Traffic knew that Plaintiff offered its services as a freight carrier and that its reputation with brokers was important to its ability to retain existing clients and obtain new clients.

39. In May 2023, Direct Traffic published the FreightGuard Report.

40.     Direct Traffic knew that the FreightGuard Report was false because, before the FreightGuard Report was published, Plaintiff advised Direct Traffic that it had no involvement with the Fraudster or the work for which the Fraudster demanded payment.

41.     The FreightGuard Report falsely and intentionally imputes to Plaintiff conduct, characteristics, or a condition incompatible with the proper exercise of its business and tends to injure Plaintiff in its business, reputation, or occupation. These false statements are so obviously defamatory and damaging to Plaintiff's reputation that they should be presumed defamatory.

42.     As a result of Direct Traffic publishing of the FreightGuard Report, Plaintiff has suffered actual damages, including harm to its reputation with third party brokers, who have been deterred from contracting with Plaintiff for business.

43.     Direct Traffic made the statements with actual malice and knowledge of the statements' falsity; the statements were intended to harm Plaintiff's business and to ruin Plaintiff financially and socially.  As a result, Plaintiff is entitled to punitive damages.

44.     There is no privilege that protects Direct Traffic's publication of the false FreightGuard Report to third parties.

WHEREFORE, Plaintiff, Moon and Star Logistics, respectfully requests this Honorable Court to enter Judgment in its favor in an amount in excess of $75,000 against Defendant Direct Traffic, plus costs, all available interest including prejudgment and post-judgment interest as allowed by law, punitive damages, and for any other relief the Court deems just and proper under the circumstances.

**COUNT II (DEFAMATION PER QUOD)**

45.     Plaintiff incorporates and realleges paragraphs 1-36 above.

46.     In the alternative to Count I (Defamation Per Se), Plaintiff alleges this claim for defamation per quod.

47. At all times relevant to this Complaint, Direct Traffic knew that Plaintiff offered its business services as a freight carrier and that its reputation with brokers was important to its ability to retain existing clients and obtain new clients.

48. In May 2023, Direct Traffic published the FreightGuard Report.

49. Direct Traffic knew that the FreightGuard Report was false because, before the FreightGuard Report was published, Plaintiff advised Direct Traffic that it had no involvement with the Fraudster or the work for which the Fraudster demanded payment.

50. The FreightGuard Report falsely indicates that Plaintiff intentionally performs unauthorized acts in the conduct of its business; improperly seeks to modify existing contracts with its customers; and engages in fraudulent activity in the performance of its work.

51. As a result of Direct Traffic publishing of the FreightGuard Report, Plaintiff has suffered actual damages, including harm to its reputation with third party brokers, who have been deterred from contracting with Plaintiff for business.

52. In addition to the damage to Plaintiff's reputation, Plaintiff also suffered special damages in the form of lost revenue and profits associated with the brokers' refusal to do business with Plaintiff based on the false FreightGuard Report, including the loss of a $700,000 contract and deactivation of its accounts by several brokers.

53. Direct Traffic made the statements with actual malice and knowledge of the statements' falsity; the statements were intended to harm Plaintiff's business and to ruin Plaintiff financially and socially. As a result, Plaintiff is entitled to punitive damages.

54. There is no privilege that protects Direct Traffic's publication of the false FreightGuard Report to third parties.

WHEREFORE, Plaintiff, Moon and Star Logistics, respectfully requests this Honorable Court to enter Judgment in its favor in an amount in excess of $500,000 against Defendant Direct Traffic, plus costs, all available interest including prejudgment and post-judgment interest as allowed by law, punitive damages, and for any other relief the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Moon and Star Logistics hereby demands a trial by jury on all counts of this Complaint.

Respectfully submitted,

By: /s/ *Moneyede M. Martin*
Moneyede M. Martin, Esq.
Florida Bar No. 059272
**LAW OFFICES OF MONEYEDE MARTIN, P.A.**
150 SE 2nd Ave., Suite 710
Miami, FL 33131
Telephone: (786) 542-5348
mmartin@mmartinlegal.com